**BLISS CLEARING NIAGARA, INC., Plaintiff,**

v.

**MIDWEST BRAKE BOND CO., Defendant.**

**No. 5:02–CV–67.**

United States District Court, W.D. Michigan, Southern Division.

May 14, 2003.

---

**944**

John M. Brown, Dykema, Gossett, PLLC, Lansing, MI, Bruce G. Davis, Douglas A. Dozeman, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for Plaintiff.

Dean W. Amburn, Robert J. Lenihan, II, Harness, Dickey & Pierce, P.L.C., Troy, MI, Richard A. Gaffin, Miller, Canfield, Paddock & Stone, PLC, Grand Rapids, MI, for Defendant.

### *OPINION*

QUIST, District Judge.

Plaintiff, Bliss Clearing Niagara, Inc. ("Bliss"), has sued Defendant, Midwest Brake Bond Co. ("Midwest"), alleging claims for trademark infringement, unfair competition, and dilution under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and (c), a claim for misappropriation under the Michigan Uniform Trade Secrets Act ("MUTSA"), M.C.L. § 445.1901–.1910, and various tort claims. Bliss alleges that, among other things, Midwest obtained and used Bliss' trade secrets, and confidential and proprietary information, to manufacture, distribute, and sell a machine identical to Bliss' "Torc–Pac 40" clutch. Now before the Court is Midwest's motion pursuant to Federal Rule of Civil Procedure 12(c) for judgment on Counts VI, VII and VIII of Bliss' complaint, which allege, respectively, claims for tortious interference with contractual relations and advantageous business opportunity, unfair competition in violation of the common law, and conversion. Midwest also seeks judgment on that portion of Count IV which alleges a common law claim for misappropriation.

### I. *Facts* [1]

Bliss is engaged in the business of developing, manufacturing, and marketing industrial clutches and other components used in various machines to manufacture products. (Compl.¶¶ 1, 7.) One of Bliss' products is the well-known "Torc–Pac 40" wet-type clutch, which it designed and began to sell in approximately 1958. (*Id.* ¶¶ 7, 11.) In addition to manufacturing and selling clutches, Bliss manufactures and sells replacement parts for the Torc–Pac 40 and other clutches and repairs and remanufactures clutches for its customers. (*Id.* ¶ 8.) During the process of designing, developing, and manufacturing the Torc–Pac 40, Bliss invested substantial resources to create detailed drawings and blueprints of the Torc–Pac 40 and its com-

---

1. The facts herein are as set forth in Bliss' complaint and, for purposes of this motion, are taken as true.

ponents. (*Id.* ¶ 11.) Such information is highly confidential and proprietary to Bliss. (*Id.* ¶ 12.)

On January 23, 1996, Bliss furnished more than 150 unpublished copyrighted drawings, including those of the Torc–Pac 40, to Midwest for the purpose of obtaining a quotation from Midwest for the manufacture of certain Torc–Pac parts. (*Id.* ¶ 16.) Bliss furnished the drawings to Midwest pursuant to a confidentiality agreement, in which Midwest acknowledged that the drawings belonged to Bliss, were confidential information, and were to be used solely for the purpose of preparing the quotation. (*Id.* ¶ 17.) The confidentiality agreement also precluded Midwest from copying or reproducing the drawings, furnishing them to others, or using them in the manufacture of the Torc–Pac 40, without Bliss' written consent. (*Id.*)

Midwest returned the drawings to Bliss on or about October 24, 2000, after counsel for Bliss demanded their return. (*Id.* ¶ 23.) Bliss alleges that prior to the time it furnished the drawings to Midwest, Midwest was manufacturing and/or distributing replicas of the Torc–Pac 40 and/or its parts, but that after receiving the drawings from Bliss, Midwest was able to refine its replicas and parts and began manufacturing and/or distributing an identical Torc–Pac 40 and parts. (*Id.* ¶¶ 19–20.) Bliss also alleges that Midwest began labeling and marketing its replica and parts using the Torc–Pac 40 trademark and began using the Torc–Pac 40 name in Midwest's informational and marketing materials without Bliss' authorization. (*Id.* ¶¶ 19, 21.) Moreover, Bliss claims that both before and after it received the drawings from Bliss, Midwest solicited several key employees with special knowledge of the Torc–Pac 40 product line away from Bliss for the purpose of obtaining Bliss' confidential and proprietary trade secrets, including customer lists. (*Id.* ¶ 22.)

On April 25, 2002, Bliss filed its complaint against Midwest alleging various claims based upon Midwest's use of the Torc–Pac 40 name and Bliss' confidential and proprietary information in the manufacture and sale of its replica Torc–Pac 40 and parts.

## II. *Motion Standard*

Midwest brings its motion under Fed. R.Civ.P. 12(c). A motion pursuant to Rule 12(c) may be brought after the close of the pleadings to raise various Rule 12(b) defenses. *Alexander v. City of Chicago,* 994 F.2d 333, 335 (7th Cir.1993). As with a Rule 12(b)(6) motion, a court must examine only the pleadings and accept all of the non-movant's allegations as true in ruling on a Rule 12(c) motion. *St. Paul Ins. Co. v. AFIA,* 937 F.2d 274, 279 (5th Cir.1991). A motion for judgment on the pleadings may be granted only where "it appears beyond doubt that the plaintiff cannot prove any set of facts that would support his claim for relief." *Thomason v. Nachtrieb,* 888 F.2d 1202, 1204 (7th Cir.1989).

## III. *Discussion*

Midwest contends that it is entitled to judgment as a matter of law on Bliss' common law claims of misappropriation, tortious interference with contractual relations and advantageous business opportunity, unfair competition, and conversion upon two grounds. First, Midwest argues that these claims are displaced by MUTSA. Second, Midwest argues that Bliss' common law misappropriation claim and the other claims occurring before enactment of MUTSA and, thus, not affected by MUTSA's displacement provision, are untimely because those claims were filed beyond the three-year statute of limitations.

### A. Displacement Under MUTSA

The Michigan Legislature enacted MUTSA, Michigan's version of the Uniform Trade Secrets Act ("UTSA"), to take

effect as of October 1, 1998. M.C.L. § 445.1910. MUTSA provides a statutory action and remedies for misappropriation of trade secrets. M.C.L. § 445.1903, 1904. The statute also displaces conflicting tort remedies for misappropriation of a trade secret. *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich.App. 125, 132, 649 N.W.2d 808, 812–13 (2002) (per curiam). In particular, Section 8 of MUTSA provides that the "act displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." M.C.L. § 445.1908(a). However, MUTSA does not displace contractual remedies, "[o]ther civil remedies that are not based upon misappropriation of a trade secret," or "[c]riminal remedies, whether or not based upon misappropriation of a trade secret." M.C.L. § 445.1908(2).

No Michigan state or federal court has interpreted or applied the displacement provision of MUTSA, although several state and federal courts have interpreted very similar versions of the UTSA adopted by other states. *See, e.g., Smithfield Ham & Prods. Co. v. Portion Pac, Inc.*, 905 F.Supp. 346, 348–49 (E.D.Va.1995) (interpreting Virginia UTSA and concluding that the plaintiff's tortious interference claims were not displaced); *Coulter Corp. v. Leinert*, 869 F.Supp. 732, 734–35 (E.D.Mo.1994) (interpreting Florida UTSA to conclude that the plaintiff's claims for unfair competition and an accounting were displaced but that the plaintiff's claim for breach of the duty of confidentiality was not barred); *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 898 (Del.2002) (interpreting Delaware UTSA to conclude that the plaintiff's unfair competition and conspiracy claims were displaced); *Frantz v. Johnson*, 116 Nev. 455, 464–65, 999 P.2d 351, 357–58 (2000) (applying Nevada UTSA and concluding that the plaintiff's claims for misappropriation of confidential information, breach of fiduciary duty, intentional interference with contractual relations, intentional interference with prospective advantage, breach of the covenant of good faith and fair dealing, civil conspiracy, and unjust enrichment were displaced). In determining whether a claim is displaced, courts generally examine whether the claim is based solely upon the misappropriation of a trade secret. If so, the claim must be dismissed. *See Craig Neon, Inc. v. McKenzie*, 25 Fed.Appx. 750, 751–52, 2001 WL 1338434, at *2 (10th Cir.2001) ("There is also no real dispute that plaintiff's fraud-and-deceit claim could stand alone even without proving that the sign plans were a trade secret."); *Thomas & Betts Corp. v. Panduit Corp.*, 108 F.Supp.2d 968, 971 (N.D.Ill.2000) (stating that "facts constituting a misappropriation of trade secrets give rise to liability under the [Illinois UTSA], but not under any other state law theory"); *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F.Supp.2d 722, 730 (N.D.Ohio 1999) ("The preemption section of the UTSA has been interpreted to bar claims which are based entirely on factual allegations of misappropriation of trade secrets."); *Coulter Corp.*, 869 F.Supp. at 734 (stating that in light of the UTSA's displacement provision, "the issue becomes whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred"); *Smithfield Ham & Prods. Co.*, 905 F.Supp. at 348–49 ("In order to survive summary judgment ... a plaintiff must be able to show that the distinct theories of relief sought are supported by facts unrelated to the misappropriation of the trade secret."). In *Weins v. Sporleder*, 1999 SD 10, 2000 SD 10, 605 N.W.2d 488 (2000), the Supreme Court of South Dakota summarized the displacement analysis as follows:

> South Dakota's adoption of the Uniform Trade Secrets Act, SDCL 37–29–7, prevents a plaintiff from merely restat-

ing their trade secret claims as separate tort claims. In analyzing claims for the purpose of applying the displacement provision, the issue is not what label the plaintiff puts on their [sic] claims. Rather, the court is to look beyond the label to the facts being asserted in support of the claims. *Leucadia, Inc. v. Applied Extrusion Technologies,* 755 F.Supp. 635 (D.Del.1991). A plaintiff "may not rely on acts that constitute trade secret misappropriation to support other causes of action." *Ed Nowogroski Ins., Inc. v. Rucker,* 88 Wash.App. 350, 944 P.2d 1093, 1097 (1997).

*Id.* 2000 SD at 13, 605 N.W.2d at 491–92. The court in *Micro Display Systems, Inc. v. Axtel, Inc.,* 699 F.Supp. 202 (D.Minn. 1988), rejected the plaintiff's argument that the UTSA displaces only conflicting law regarding trade secrets as too broad because it "would allow simultaneous common law statutory actions in the same trade secret case." *Id.* at 204. However, the court also found that displacement "is not as broad as defendants suggest." *Id.* at 205. Rather, the court held: "Only that law which conflicts with the MUTSA is displaced. Conflicting law is that law dealing exclusively with trade secrets. To the extent a cause of action exists in the commercial area *not* dependent on trade secrets, that cause continues to exist." *Id.*

Although Bliss argues that its claims are not displaced, Bliss contends that the motion should be denied for another reason, namely, that the parties dispute whether the information at issue constitutes a trade secret governed by MUTSA. Bliss contends that in light of this dispute, the Court cannot determine the issue of displacement on a motion to dismiss, because to do so, the Court would need to resolve a disputed issue of fact. Thus, according to Bliss, if the information does not constitute a trade secret, Bliss' claims cannot be preempted by MUTSA and should be allowed to go forward. As support for its argument, Bliss cites *Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co.,* 191 F.Supp.2d 652 (E.D.Va.2002). In that case, the parties disputed whether the confidential information at issue constituted trade secrets. *Id.* at 659. The court observed that in such cases, "courts have refused to find the claims preempted." *Id.* at 658. The court also noted that in other cases where courts have found preemption on a motion to dismiss, they have determined that the information, as alleged, constitutes trade secrets. *Id.* at 658–69. The court observed:

> The plain meaning of the statute, coupled with decisions interpreting similar preemption provisions in the context of a motion to dismiss, make it apparent that, unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the [Virginia UTSA].

*Id.* at 659.

The primary authority cited by the *Stone Castle* court for the proposition that courts refuse to find preemption where it has not been determined whether the information at issue is a trade secret was *Combined Metals of Chicago Limited Partnership v. Airtek, Inc.,* 985 F.Supp. 827 (N.D.Ill.1997). In *Combined Metals,* the plaintiff conceded that its breach of fiduciary duty claim would be preempted if its die and design specifications qualified as a trade secret, but argued that it should be allowed to fall back on that claim if the information did not qualify as a trade secret. *Id.* at 830. The court found merit to the argument, "at least in theory," and noted its reluctance to dismiss the claim based upon the defendant's failure to address it. *Id.* The court reasoned:

> The ITSA clearly preempts all common law claims that are based on the misappropriation of a trade secret. By

its plain language, however, the ITSA preemption provision applies only if the claim is based on the "misappropriation of a trade secret." The ITSA has no effect on a claim that is not based on the "misappropriation of a trade secret."

Thus, in the instant case, if the Airtek die and design specifications fail to qualify as a trade secret, how could the breach of fiduciary duty count be preempted under the ITSA? Again, the ITSA preempts only counts premised on the misappropriation of a trade secret. Thus, if the Airtek die and specifications is not a trade secret or secrets, the ITSA preemption provision is inapplicable.

*Id.* (internal citations and footnote omitted).

In *Learning Curve Toys, L.P. v. Playwood Toys, Inc.*, No. 94 C 6884, 1999 WL 529572 (N.D.Ill. July 20, 1999), the court held that a claim may be displaced even if the information at issue does not constitute a trade secret. *Id.* at *3. The court noted that the purpose of the UTSA was to "codify all the various common law remedies for theft of ideas" and that "plaintiffs who believe their ideas were pilfered may resort only to the ITSA." *Id.* Thus, the court concluded:

> the ITSA does not, as PlayWood contends, simply preempt common law claims for which misappropriation of a trade secret is an element. Rather, the provision eliminated common law claims based on conduct which might support an ITSA action. In other words, if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois. This strict interpretation is fatal to PlayWood's idea misappropriation and unjust enrichment counterclaims
> . . . .

*Id.; accord Thomas & Betts Corp.*, 108 F.Supp.2d at 972–73 (noting that such an argument would render the UTSA's displacement provision "meaningless, for it would forbid preemption of state law claims until a final determination has been made with respect to whether the confidential information at issue rises to the level of a trade secret"). In its analysis, the *Learning Curve* court quoted from *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263 (7th Cir.1992) (per curiam), where, in considering whether the plaintiff could maintain unfair competition and fiduciary duty claims based upon the defendants' use of the plaintiff's secret information, the Seventh Circuit stated: "Illinois has abolished all common law theories of misuse of such information. Unless defendants misappropriated a (statutory) trade secret, they did no legal wrong." *Id.* at 1265. *See also Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 898 (Del.2002) (implicitly rejecting the plaintiff's argument that "the dismissal of [its] common law claims was premature because the trial court ha[d] not yet determined that a trade secret exists"). *BioCore, Inc. v. Khosrowshahi*, 96 F.Supp.2d 1221 (D.Kan. 2000), cited by Midwest, is consistent with *Learning Curve*. In *BioCore*, the court rejected the plaintiffs' contention that they could still assert a claim for misappropriation of confidential information even if the defendant did not misappropriate trade secrets. *Id.* at 1236–37. The court observed that Kansas courts do not distinguish between trade secrets and confidential information, and stated that "[e]ven if confidential information can be something less than a trade secret, it must at least be a trade secret to give its owner a property right in it." *Id.* at 1238.

■ For the reasons stated by the court in *Learning Curve*, the Court concludes that the disputed status of information as a trade secret does not preclude a court

from determining whether a claim or claims are displaced by the MUTSA. Because the purpose of the UTSA is "to preserve a single tort cause of action under state law for misappropriation ... and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation," *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 755 F.Supp. 635, 637 (D.Del.1991), allowing otherwise displaced tort claims to proceed on the basis that the information may not rise to the level of a trade secret would defeat the purpose of the UTSA. Thus, "[u]nless [Midwest] misappropriated a (statutory) trade secret, [it] did no legal wrong." *Composite Marine Propellers, Inc.*, 962 F.2d at 1265.

### 1. Tortious Interference

 To establish a claim for tortious interference with a contract, a plaintiff must allege: (1) the existence of a contract; (2) a breach; and (3) an unjustified instigation of the breach by the defendant. *Mahrle v. Danke*, 216 Mich.App. 343, 350, 549 N.W.2d 56, 60 (1996). The elements of tortious interference with a business relationship are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by the defendant; (3) intentional interference by the defendant which induces or causes a breach or termination of the relationship or expectancy; and (4) damage to the plaintiff. *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 698, 552 N.W.2d 919, 925 (1996) (per curiam). A plaintiff seeking to establish a tortious interference claim

> must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose invading plaintiff's contractual rights or business relationship. Under the latter instance, plaintiff necessarily must demonstrate, which specificity, affirmative

acts by the interferor which corroborate the unlawful purpose of the interference.

*Feldman v. Green*, 138 Mich.App. 360, 369–70, 360 N.W.2d 881, 886 (1984) (per curiam). An act does not constitute improper motive or interference "[w]here the defendant's actions were motivated by legitimate business reasons." *BPS Clinical Labs.*, 217 Mich.App. at 699, 552 N.W.2d at 925. "However, where a defendant's actions overreach the bounds of permissible interference and improperly sabotage the contractual agreements of others, a defendant is not immune from liability." *Kavanaugh v. VMC Indus., Inc.*, No. 213219, 2000 WL 33400199, at *3 (Mich.App. Nov. 1, 2000) (per curiam).

In paragraph 60 of its complaint, Bliss alleges: "Despite such knowledge [of Bliss's contractual and advantageous business relationships], Midwest Brake intentionally solicited, with the knowledge and use of Bliss' trade secrets ... some or all of Bliss' Torc–Pac 40 business. Such solicitation was done without justification and for illegal, malicious and/or improper purpose." (Compl.¶ 60.) Midwest contends that Bliss' intentional interference claim is barred because it relies solely upon allegations of trade secret misappropriation. If the three paragraphs set forth in Count VI were the only possible factual allegations relating to the tortious interference claim, the Court would agree that the claim is based solely upon misappropriation of trade secrets. However, paragraph 57 incorporates all of the general allegations of the complaint into the tortious interference claim. While those allegations generally pertain to misappropriation of trade secrets, Bliss also alleges that Midwest labeled and marketed its replica and parts using the Torc–Pac 40 trademark and included the Torc–Pac 40 name in its marketing and informational materials. (*Id.* ¶¶ 19, 21.) Bliss also contends that "[s]uch

unauthorized use was intentional, deceitful and was intended to cause and, in fact, caused confusion among Bliss' customers and others in the marketplace." (*Id.* ¶ 21.) It is not clear whether those allegations are related to the tortious interference claim, but if Bliss' claim is that Midwest used the Torc–Pac 40 trademark or name in soliciting Bliss' customers, then Bliss' tortious interference claim would be based upon wrongful conduct independent of the misappropriation of trade secrets. Further discovery may shed more light on this claim, and Midwest is not precluded from raising it again on a motion for summary judgment.[2] Therefore, the Court will deny the motion with regard to the tortious interference claim.

## 2. Unfair Competition

In support of its unfair competition claim, Bliss alleges that "[t]he foregoing conduct constitutes an unfair method of competition." (*Id.* ¶ 63.) As Midwest notes, much of the "foregoing conduct" involves the alleged misappropriation of trade secrets. To the extent that the unfair competition claim is based upon the theft or misuse of trade secrets, the claim would be preempted. However, as indicated above, Bliss also alleges that Midwest used Bliss' Torc–Pak 40 trademark and name in attempting to market its replica and parts to Bliss' customers. Based upon the allegations in the complaint, it is unclear whether Midwest's alleged use of the Torc–Pak 40 trademark and name are independent of the conduct supporting the misappropriation claim. If so, such conduct would support a claim for unfair competition without regard to the existence of

trade secrets. *See Parameter Driven Software, Inc. v. Mass. Bay Ins. Co.,* 25 F.3d 332, 336 n. 4 (6th Cir.1994). Therefore, the Court will deny Midwest's motion on the unfair competition claim.

## 3. Conversion

■ In its conversion claim, Bliss alleges that it "is the true and rightful owner of Bliss' confidential proprietary and trade secret rights in the Torc–Pac 40." (*Id.* ¶ 66.) Bliss also alleges that by improperly using such information without Bliss' authorization, "Midwest Brake has deprived Bliss of its exclusive, confidential proprietary and trade secret rights and interests in the Torc–Pac 40." (*Id.* ¶¶ 67, 68.) Midwest contends that removing the trade secret allegations would effectively eviscerate Bliss' conversion claim. The Court agrees. Bliss' allegations center exclusively on Midwest's alleged unauthorized use of Bliss' trade secrets. There are no allegations in the complaint that give rise to a conversion claim apart from the use of trade secrets. Bliss contends that the complaint contains adequate allegations to support a conversion claim based upon Midwest's alleged wrongful retention and use of Bliss' physical property, such as blueprints and drawings, as well as intangible property, without Bliss' consent. In spite of Bliss' argument, the focus of the conversion claim is upon trade secrets. A similar argument was rejected in *Thomas & Betts Corp. v. Panduit Corp.,* 108 F.Supp.2d 968 (N.D.Ill.2000). There, the plaintiff argued that its conversion claim was not based merely upon the theft of confidential information, but also alleged

---

**2.** For example, it may be that but for Midwest's alleged misappropriation of trade secrets, Midwest would not have used the Torc–Pac 40 trademark and/or name. However, given Bliss' allegation that Midwest manufactured and/or distributed some replicas and/or similar parts prior to receiving the drawings

from Bliss, it is unclear from the complaint whether Midwest's use of the trademark and/or name arose solely out of the misappropriation of trade secrets. This uncertainty may be clarified at the summary judgment stage.

the taking of the actual computers, disks, and paper belonging to the plaintiff. The court disagreed, noting that those items had little value apart from the confidential information they contained. *Id.* at 973. Here, Bliss' complaint makes clear that it is trade secrets, rather than tangible property, that was converted, and there is no allegation that Bliss seeks damages for the taking of the physical property (the paper containing the blueprints and drawings). Therefore, the conversion claim will be dismissed to the extent that it is based upon acts occurring after passage of MUTSA.

#### 4. Common Law Misappropriation

 Bliss contends that its common law misappropriation claim may proceed along with its misappropriation claim under MUTSA, because Michigan's common law of trade secrets does not conflict with MUTSA. The Court rejects this argument because it "would allow simultaneous common law and statutory actions in the same trade secret case." *Micro Display Sys., Inc.*, 699 F.Supp. at 204. Bliss does not argue that its common law claim is not based upon the theft of trade secrets, nor does it attempt to distinguish its common law claim from its statutory claim. Therefore, the Court concludes that Bliss' common law misappropriation claim is displaced to the extent it relies upon allegations of misappropriation occurring after the effective date of MUTSA.

### B. Statute of Limitations

Midwest contends that Bliss cannot possibly have a claim for common law misappropriation because: (1) such a claim occurring after October 1, 1998, the date MUTSA took effect, would be displaced by MUTSA; and (2) any claim arising prior to enactment of MUTSA would be barred by the applicable three-year limitations period, as Bliss filed its complaint on April 25, 2002—more than three years after MUT-SA became effective. In addition, Midwest notes that Michigan did not recognize a continuing violation theory for tolling the statute of limitations in misappropriation cases prior to the enactment of MUTSA, *see Shatterproof Glass Corp. v. Guardian Glass Co.*, 322 F.Supp. 854, 869 (E.D.Mich. 1970), and MUTSA does not apply to any continuing misappropriation that began before the effective date of the act, M.C.L. § 445.1910.

Bliss does not dispute that its common law misappropriation claim is subject to the three-year limitations period set forth in M.C.L. § 600.5805(9), *see Pilkington Bros., P.L.C. v. Guardian Indus. Corp.*, No. 83–5260, 1986 WL 9876, at *2 (E.D.Mich. June 9, 1986), and concedes that common law misappropriation is not recognized as a "continuing tort" in Michigan. Bliss argues, however, that the discovery rule applies to its common law claim for misappropriation. The discovery rule provides that the limitations period "does not begin to run until the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, that he had a possible cause of action." *Thomas v. Process Equip. Corp.*, 154 Mich. App. 78, 88, 397 N.W.2d 224, 228 (1986). Bliss cites *Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*, 93 F.Supp.2d 808 (E.D.Mich.2000), as support for its contention that the discovery rule applies to its misappropriation claim. There, the court stated that the "three-year period begins to run 'when the plaintiff knew or reasonably should have known of [the] defendant's misappropriation,' and a plaintiff has 'an affirmative duty . . . to exercise reasonable diligence to discover its claim.'" *Id.* at 831–32 (quoting *Pilkington Bros.*, 1986 WL 9876, at *3).

Midwest contends that the discovery rule does not apply to misappropriation claims and that *Rainbow Nails* is not an

accurate statement of the law. Midwest notes that *Rainbow Nails* relied upon *Pilkington Brothers, P.L.C. v. Guardian Industries Corp.*, No. 83–5260, 1986 WL 9876 (E.D.Mich. June 9, 1986), which in turn relied upon *Reynolds–Southwestern Corp. v. Dresser Industries*, 438 S.W.2d 135 (TexCivApp—Hous (14 Dist.) 1969). *See Pilkington Bros.*, 1986 WL 9876, at *3. Midwest further notes that the *Reynolds–Southwestern* holding regarding the discovery rule was abrogated by the Texas Supreme Court's decision in *Computer Associates International, Inc. v. Altai, Inc.*, 918 S.W.2d 453 (1996). In *Computer Associates,* the court held that the discovery rule does not apply to misappropriation of trade secret cases. *Id.* at 457–58. The court observed that it has only applied the rule "in those cases where the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Id.* at 456. Further, the court stated: "Inherently undiscoverable encompasses the requirement that the existence of the injury is not ordinarily discoverable, even though due diligence has been used." *Id.* The court found that in contrast to other types of cases, such as malpractice and breach of fiduciary duty, trade secret misappropriation is "generally capable of detection within the time allotted for bringing such suits." *Id.* at 456–57. Finally, the court stated: "No state supreme court ... has yet adopted the discovery rule exception for trade secret cases as an exercise of its common law jurisdiction.... We decline to be the first." *Id.* at 458.

In providing guidance for application of the discovery rule, the Michigan Supreme Court has stated that

> in deciding whether to strictly enforce a period of limitation or impose the discovery rule, [a court] must carefully balance when the plaintiff learned of her injuries, whether she was given a fair opportunity to bring her suit, and whether

defendant's equitable interest would be unfairly prejudiced by tolling the statute of limitations.

*Stephens v. Dixon,* 449 Mich. 531, 536, 536 N.W.2d 755, 757 (1995). The *Stephens* court noted that it has only applied the discovery rule in medical malpractice cases, negligent misrepresentation cases, products liability actions for asbestos-related diseases, and products liability actions for pharmaceutical products. *Id.* at 537, 536 N.W.2d at 757. The court stated that the discovery rule was appropriate in such cases because " 'the concern for protecting defendants from "time-flawed evidence, fading memories, lost documents, etc." is less significant in these cases.' " *Id.* at 537, 536 N.W.2d at 757–58 (quoting *Larson v. Johns–Manville Sales Corp.,* 427 Mich. 301, 312, 399 N.W.2d 1, 6 (1986) (quoting *Eagle–Picher Indus., Inc. v. Cox,* 481 So.2d 517, 523 (Fla.App.1985))). The *Stephens* court held that the discovery rule does not apply in cases involving ordinary negligence where the plaintiff merely misjudges the severity of her injury—in that case, arising out of an automobile accident—because the plaintiff in such a case should know at the time of the injury whether she has been injured. *Id.* at 537–38, 536 N.W.2d at 758.

No Michigan court has considered whether the discovery rule may apply in a trade secrets case. In *Brennan v. Edward D. Jones & Co.,* 245 Mich.App. 156, 626 N.W.2d 917 (2001) (per curiam), however, the Michigan Court of Appeals considered whether the discovery rule should be applied to commercial conversion actions. The court held that the discovery rule should not apply to such an action:

> We conclude that the strong public policies favoring finality in commercial transactions, protecting a defendant from stale claims, and requiring a plaintiff to diligently pursue his claim out-

weigh the prejudice to plaintiffs and militate against applying the discovery rule in the context of commercial conversion cases. The majority of states have also refused to apply the discovery rule in commercial conversion cases.

*Brennan,* 245 Mich.App. at 160, 626 N.W.2d at 920 (citations omitted). The court also rejected the plaintiffs' assertion that the law does not require property owners to verify that their possessions have not been stolen, noting that:

> those jurisdictions that have refused to apply the discovery rule in commercial conversion cases have presumed that property owners "know what and where their assets are, despite the fact that the presumption may work a hardship upon the property owner who fails to discover his or her ownership rights until after the period has run."

*Id.* at 160–61, 626 N.W.2d at 920 (quoting *Fuscellaro v. Indus. Nat'l Corp.,* 117 R.I. 558 563, 368 A.2d 1227 (1977)).

■ Based upon the Michigan Supreme Court's limited application of the discovery rule, the Court concludes that the Michigan Supreme Court would hold, consistent with the Texas Supreme Court, that the discovery rule does not apply to trade secrets cases. As is the case with conversion of tangible property, misappropriation of trade secrets is not the type of undiscoverable wrong which generally merits the application of the discovery rule. Just as a property owner should know what and where his assets are, the owner of a trade secret must take steps to ensure the secrecy of proprietary information and monitor usage by competitors. In this regard, the Texas Supreme Court has observed:

> [W]e live in a world of high employee mobility and easy transportability of information. Under these circumstances, it is not unexpected that a former employee will go to work for a competitor and that the competitor might thereby

acquire trade secrets.... Vigilance in the area of trade secrets is required, particularly because once a trade secret is made public all ownership is lost. High employee mobility and critical interest in maintaining a proprietary interest in a trade secret are endemic to the computer software industry. Suspicions should abound when a competitor markets a product similar to that previously developed by a former employer after one of the former employer's employees begins to work for the competitor.

*Computer Assocs. Int'l,* 918 S.W.2d at 457 (internal citations omitted). In a similar vein, Bliss recognized the importance of protecting its confidential information when it required Midwest to sign a confidentiality agreement ensuring limited use of the drawings and blueprints by Midwest. Bliss was obviously aware of the risks associated with disclosure of its confidential information to others. If Midwest was using Bliss' trade secrets to market a replica Torc–Pac 40 and parts as Bliss claims, Bliss could have discovered the misappropriation through vigilant inquiry and monitoring of Midwest. Thus, the Court will not apply the discovery rule to Bliss' misappropriation claim, and that claim will be dismissed in its entirety.

The Court will also dismiss the conversion claim because it is governed by the three-year limitations period and the discovery rule does not apply to such a claim. *Brennan,* 245 Mich.App. at 158, 160–61, 626 N.W.2d at 917, 920. Although the Court has determined, at least at this juncture, that Bliss' unfair competition and tortious interference claims are not displaced by MUTSA, the Court concludes that those claims, which are also subject to the three-year limitations period, *see James v. Logee,* 150 Mich.App. 35, 38, 388 N.W.2d 294, 296 (1986) (per curiam) (tortious interference); *Deuer Mfg., Inc. v.*

**954**

*Kent Prods., Inc.,* Nos. 89–1583, 89–1588, at *2 (Fed.Cir. June 12, 1990) (unfair competition), should be dismissed to the extent they rely upon acts occurring more than three years prior to April 25, 2002—the date Bliss filed its complaint. Furthermore, the Court concludes, for the reasons discussed in connection with the misappropriation claim, that the discovery rule does not apply to unfair competition and tortious interference claims. Therefore, those claims will be dismissed in part.

### IV. *Conclusion*

For the foregoing reasons, the Court will grant in part and deny in part Midwest's motion for judgment on the pleadings. Bliss' common law misappropriation and conversion claims will be dismissed. Bliss' unfair competition and tortious interference claims will be dismissed only to the extent that the acts supporting those claims occurred prior to April 25, 1999.

An Order consistent with this Opinion will be entered.