**ETHYPHARM S.A. FRANCE and Ethypharm S.A. Spain, Plaintiffs,**

v.

**BENTLEY PHARMACEUTICALS, INC., Defendant.**

**No. 04–1300–SLR.**

United States District Court, D. Delaware.

Sept. 26, 2005.

Francis J. Murphy, Esquire, of Murphy Spadaro & Landon, Wilmington, DE, for Plaintiffs. Of Counsel: Dwight P. Bostwick, Esquire, of Baach Robinson & Lewis, Washington, DC.

Richard L. Horwitz, Esquire, and David E. Moore, Esquire of Potter Anderson & Corroon, Wilmington, DE, for Defendant. Of Counsel: Craig E. Stewart, Esquire, and Marc J. Goldstein, Esquire, of Palmer & Dodge, Boston, MA.

### MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

On September 27, 2004, plaintiffs Ethypharm S.A. France and Ethypharm S.A. Spain filed this suit against defendant Bentley Pharmaceuticals, Inc. alleging fraud, violation of the Delaware Uniform Trade Secret Act ("DUTSA"), unjust enrichment and intentional interference with actual and prospective business relationships. (D.I. 1)

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Pending before the court is defendant's motion to dismiss for failure to join an indispensable party, pursuant to Fed. Rule Civ. P. 19(a) and (b), and to dismiss counts one, three and four as preempted by the DUTSA. (D.I. 9)

## II. BACKGROUND

Plaintiff Ethypharm S.A. France is a French corporation with its principal office in France. (D.I. 1 at ¶ 27) Plaintiff Ethypharm S.A. Spain is a majority owned subsidiary of Ethypharm S.A. France organized under the laws of Spain with its principal office in Madrid. (D.I. 1 at ¶ 28) Plaintiffs are engaged in developing proprietary drug delivery systems and formulating, clinically testing, registering, manufacturing, marketing and licensing pharmaceutical products based on their drug delivery systems. (*Id.*) Defendant Bentley Pharmaceuticals, Inc. is a Delaware corporation in the pharmaceutical industry. (D.I. 1 at ¶ 4) Belmac S.A. ("Belmac") is a wholly-owned Spanish subsidiary of defendant. (D.I. 1 at ¶ 5)

According to plaintiffs, in the early 1990's, they entered into an arrangement with defendant Bentley "directly and through Bentley's agent . . . Belmac." (D.I. 1 ¶ 5) According to the arrangement, plaintiffs supplied access to intellectual property and trade secrets regarding the production, manufacture and sale of Omeprazole and other products.[1] (D.I. at ¶ 6)

---

1. According to plaintiffs, the intellectual property and trade secrets include:
   (a) The process, know-how and machinery necessary for the manufacture of Omeprozole and other products including Lansoprazole;
   (b) Specifications, trade secrets, and technical, analytical know-how associated with quality assurance, production and improvements of Omeprazole and other products including Lansoprazole;
   (c) Know-how and trade secrets including procedure, studies and instructions necessary for Bentley and its agents, Belmac S.A., to obtain full compliance with GMP regulations relating to the manufacture of Omeprazole and other products such as Lansporazole;
   (d) Know-how and trade secrets relating to the confidential formulae and analytic procedures necessary for Bentley and its agent, Belmac S.A., to obtain registration with the requisite health authorities for Omeprazole and other products such as Lansoprazole; and

According to the complaint, in exchange for plaintiffs' information and machinery, Omeprozole was manufactured exclusively for plaintiffs at Belmac's facilities in Spain. (D.I. 1 at ¶ 54, 53, 59) Plaintiffs allege this arrangement was negotiated by defendant "directly and through its agent, Belmac." (D.I. 1 at ¶ 53) Specifically, plaintiffs allege James Murphy, as an officer of defendant, visited Spain and France to meet with plaintiffs' representatives to discuss the arrangement. (D.I. 1 at ¶ 49) Plaintiffs assert that Belmac entered into the arrangement at defendant's direction and as part of a unified business strategy developed by defendant. (D.I. 1 at ¶ 63) Plaintiffs assert that "[a]t all times relevant to this complaint, Belmac S.A. has acted as Bentley's agent with actual and/or apparent authority in its interactions and communications with Ethypharm." (D.I. 1 at ¶ 63)

In its motion to dismiss, defendant argues the arrangement with plaintiffs was negotiated completely by Belmac and Belmac was not acting on defendant's behalf. (D.I. 10 at 3) According to defendant, at the time of the relationship between Belmac and plaintiffs, defendant had no role in the day-to-day operations of Belmac and did not participate in the business relationship between Belmac and plaintiffs. (D.I. 10 at 3) In support of this assertion, defendant attached to its motion declarations by Adolfo Herrera, the general manager of Belmac, and James Murphy, chairman, president, chief executive officer and a director of defendant. (D.I. 11 at A–42, A–101) Defendant further asserts that the contracts and negotiations between Belmac and plaintiffs were conducted on behalf of Belmac by its general manager, Adolfo Herrera, and his predecessors. (D.I. 10 at 3) According to defendant, it had no rights, obligations, or duties under any agreements executed by Belmac with plaintiffs. (D.I. 11 at 3) Furthermore, defendant asserts "Belmac never acted on Bentley's behalf during these negotiations or during contracting with Ethypharm." (*Id.*)

Belmac manufactured Omeprazole for plaintiffs from 1992 through 2002.[2] (D.I. 1 at ¶ 10, 84) Plaintiffs assert that during this time, "Bentley and its agent, Belmac S.A., clearly and repeatedly confirmed and acknowledged that the machinery, know-how, processes, and technology used in the manufacturing of Omeprazole were proprietary to Ethypharm." (D.I. 1 at ¶ 62) For example, plaintiffs state that Belmac employees were required to sign confidentiality statements to that effect. (*Id.*) Plaintiffs assert that "Bentley has been lying to the public and to Bentley's shareholders to create the false and misleading impression that Bentley, rather than Ethypharm, holds a proprietary interest in the technology, trade secrets, know-how ... relating to the manufacture and sale of Omeprazole." (D.I. 1 at ¶ 68) Plaintiffs assert that "Bentley and its agent, Belmac S.A., embarked on a bold scheme to steal Ethypharm's machinery, know-how, trade secrets, technology, ... processes, formulae, and analytical methods." (D.I. 1 at ¶ 84)

Defendant counters, by way of declaration, that shortly after Belmac began to manufacture Omeprazole, Belmac discovered that plaintiffs' patented process was not adequate and, thus "proceeded to de-

---

(e) Know-how and trade secrets relating to marketing approval techniques, customer contacts/lists and pricing information for Omeprazole and other products such as Lansoprazole.

(D.I. 1 at ¶ 6) Omeprazole is a medication used in the treatment of heart burn and acid reflux. (D.I. 1 at ¶ 1) Plaintiffs include Lansoprazole sporadically in the complaint, but Omeprazole is the product mentioned with specificity.

**2.** The terms of the agreement have not been made a part of the record to date.

velop its own manufacturing process, utilizing its own funds, including conducting all necessary clinical trials." (D.I. 11 at 4) Furthermore, defendant asserts it had no involvement in these efforts by Belmac. (*Id.*) Defendant states that Belmac eventually developed a successful organic process and formulation for manufacturing Omeprazole. (*Id.*)

## III. STANDARD OF REVIEW

Because the parties have referred to matters outside the pleadings, defendant's motion to dismiss shall be treated as a motion for summary judgment. *See* Fed. R.Civ.P. 12(b)(6). A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

If Belmac is deemed a necessary and indispensable party under Fed.R.Civ.P. 19, diversity jurisdiction would be extinguished and the case dismissed.[3] To avoid dismissal, plaintiffs have asserted an agency theory. If plaintiffs can establish that Belmac acted as an agent of defendant, defendant would be held vicariously liable for Belmac's acts. Plaintiffs, in their briefs, do not contest that Belmac is a necessary and indispensable party under a Rule 19 analysis. Rather, plaintiffs assert that Belmac is the agent of defendant and,

---

**3.** Joining Belmac would eliminate the basis of the court's diversity jurisdiction and warrant dismissal of the action under Rule 12(b)(1). *See Karazanos v. Madison Two Assocs.*, 147 F.3d 624, 626–27 (7th Cir.1998) (citing cases for the principle that diversity does not exist when a resident of the United States and a foreign entity constitute one party and the opposing party is all foreign entities); *Dresser Industries, Inc. v. Underwriters at Lloyd's of London, et al.*, 106 F.3d 494, 499 (3d Cir. 1997) (concluding applying complete diversity rule in suits between alien on one side and aliens and citizens on the other "makes sense").

therefore, need not be joined. The court concludes discovery is necessary to develop this claim.

## A. Joinder of Indispensable Parties

█ Federal Rule of Civil Procedure 19 dictates when potential parties to an action must be joined. The rule requires a two-step process. First, a court must determine whether a party is "necessary." *See* Fed.R.Civ.P. 19(a). A party is necessary when,

> in the person's absence complete relief cannot be accorded among those already parties, or ... the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... impede the person's ability to protect that interest or ... leave any of the persons already parties subject to substantial risk of incurring ... inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). Second, if diversity jurisdiction would be destroyed by the joinder of a necessary party, the court must determine if the potential party is an indispensable party. *See* Fed.R.Civ.P. 19(b). When deciding whether a party is indispensable, a court should consider four factors:

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to ... those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate;

fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b).

### 1. Rule 19 Joinder

█ Under a Rule 19 analysis, Belmac is a necessary and indispensable party. Belmac is a necessary party because plaintiffs' interactions were almost entirely with Belmac and not with defendant. Belmac will possess the necessary witnesses and information pertinent to determining what acts were performed, by whom, and whether the acts were wrongful. Because of its conduct, Belmac may be the only party liable for the obligations under the agreement. Therefore, complete relief cannot be afforded among the present parties.[4] *See Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 836 (D.Del.1978) (holding that when subsidiary, not parent, signed a contract, the subsidiary may be the only party liable for the obligations under the contract and is therefore a necessary party under Rule 19(a)); *Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553 (5th Cir.1985) (holding joinder of subsidiary necessary when subsidiary was key participant in alleged conversion); *Johnson & Johnson v. Coopervision, Inc.*, 720 F.Supp. 1116, 1128 (D.Del. 1989) (finding a wholly owned subsidiary was an indispensable party to parent's fraud and breach of contract action).

### 2. Agency

To avoid dismissal, plaintiffs assert an agency theory. Plaintiffs argue that defendant is vicariously liable for the acts of Belmac because Belmac acted as defendant's agent and, therefore, Belmac need not be joined.[5] (D.I. 13 at 13–14)

---

**4.** In April of 2005, Ethypharm S.A. Spain filed suit in the Mercantile Court of Madrid against Belmac alleging infringement of its Spanish Omeprazole patents. (D.I. 23 at 2) Plaintiffs would not be prejudiced by a dismissal because an alternative forum exists for them to seek judgment against Belmac.

**5.** Plaintiffs also advance the theory of liability based on defendant's role as a joint tortfeasor. However, the briefs focus solely on the agency relationship.

■ A parent company is not liable for the actions of a subsidiary solely because of the parent-subsidiary relationship. *See United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). A finding of liability requires piercing the corporate veil. *Id.* Prior case law establishes two distinct tests for determining when piercing the corporate veil is appropriate: (1) the alter ego test; or (2) the agency test. *See, e.g., Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–486 (3d Cir.2001); *C.R. Bard Inc. v. Guidant Corp.*, 997 F.Supp. 556, 559–560 (D.Del. 1998); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 265–272 (D.Del. 1989). Plaintiffs assert only the agency approach.

■ If a parent corporation directs the allegedly infringing activity of a subsidiary, the parent can be liable for its subsidiary's infringement. The focus of this test is on "the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim." *C.R. Bard, Inc.*, 997 F.Supp. at 560. In order for the parent corporation to be liable under this test, there must be "a close connection between the relationship of the corporations and the cause of action." *Id.*

Because it is unclear what the relationship is between defendant and Belmac, it is unclear how much control defendant has over Belmac. It is undisputed that defendant has some control over Belmac because it has oversight obligations for Belmac. (D.I. 11 at A–105 ¶ 12) At some point, it must be able to direct Belmac's activities to fulfill these obligations. However, it is unclear whether it directed the alleged infringing activities at issue. Plaintiffs are entitled to discovery on this issue. *Manchak v. Rollins Enviornmental Services, Inc.*, 1996 WL 790100, *4 (D.Del.1996) (concluding discovery on the issue of agency is warranted).

■ Defendant asserts that plaintiffs have not sufficiently alleged an agency relationship in the complaint. (D.I. 17 at 2) In federal civil cases, "a claimant does not have to set out in detail the facts upon which a claim is based, but must merely provide a statement sufficient to put the opposing party on notice of the claim." *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir.2001). "All the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (citations omitted); *see, e.g., Lear v. Equitable Life Assurance Soc. of U.S.*, 798 F.2d 1128, 1131 n. 4 (8th Cir.1986) (concluding that a statement in a complaint that person was an insurance agent employed by defendant with either actual or apparent authority to transact defendant's business is sufficient to plead agency in compliance with Fed.R.Civ.P. 8). Plaintiffs' complaint includes the language, "Bentley, directly and through its agent, Belmac S.A." This language is sufficient to put defendant on notice of plaintiffs' claim of vicarious liability for the acts of its alleged agent, Belmac.

Therefore, defendant's motion to dismiss is denied without prejudice to renew if, as discovery proceeds, it becomes evident that defendant cannot be liable either as a joint tortfeasor or under the agency test.

**B. Preemption of Common Law Claims By DUTSA**

■ Plaintiff alleges fraud (count one), violation of 6 Del. C. § 2001 et seq (count two), unjust enrichment (count three) and intentional interference with actual and prospective business relationships (count four). Defendant moves to have counts

one, three and four dismissed as preempted by the DUTSA. The DUTSA "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret." 6 Del. C. § 2007(a).[6] The court concludes that counts one and three are preempted by the DUTSA, but count four cannot be dismissed at this stage.

The court, in *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 755 F.Supp. 635 (D.Del.1991), addressed the issue of common law preemption by the DUTSA. In that case, the court noted that the legislature's professed purpose in adopting the DUTSA was to "make uniform the law with respect to" trade secrets. *Id.* at 637 (citing 6 Del. C. § 2008). "Section 2007 was intended to preserve a single tort cause of action under state law for misappropriation as defined in 6 Del. C. § 2001(2) and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation." *Id.* at 637; *see also, Savor, Inc. v. FMR Corp.*, 2001 WL 541484, *4 (Del.Super.2001) (holding the "displacement" of section 2007 applies to claims "grounded in the same facts which purportedly support the misappropriation of trade secrets claim"). Because all claims stemming from the same acts as the alleged misappropriation are intended to be displaced, a claim can be displaced even if the information at issue is not a trade secret. Thus, a determination of whether the information at issue constitutes a trade secret under the DUTSA need not be addressed prior to making a determination of displacement. *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F.Supp.2d 943, 948–49 (W.D.Mich.2003) ("[T]he Court concludes that the disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by the MUTSA."); *AutoMed Technologies, Inc. v. Eller*, 160 F.Supp.2d 915, 921–22 (N.D.Ill.2001) (rejecting the reasoning that plaintiff can plead in the alternative and the common law theories for recovery would apply if the information is ultimately found not to be a trade secret); *Burbank Grease Services v. Sokolowski*, 278 Wis.2d 698, 693 N.W.2d 89, 101–02 (2005) (construing the displacement provision to preempt common law claims for unauthorized use of confidential information that does not meet the statutory definition of trade secret as well as common law claims based on allegations or evidence of misappropriation of a trade secret).

The issue then becomes whether counts one, three and four of plaintiffs' complaint are "founded on allegations of trade secret misappropriation." *Leucadia*, 755 F.Supp. at 637. The issue has been stated as whether the failure of the misappropriation claim would doom the common law claim. *Smithfield Ham and Products Co. v. Portion Pac, Inc.*, 905 F.Supp. 346, 350 (E.D.Va.1995). If so, the common law claim would be barred by the trade secret statute. *Id.* A claim will be preempted if it is "grounded in the same facts which purportedly support the Misappropriation of Trade Secrets claim." *Savor*, 2001 WL 541484, *4 (Del.Super.2001). The court concludes that the claims for fraud and unjust enrichment are preempted by the DUTSA. However, the motion with respect to the intentional interference count is denied, without prejudice to renew if determined to be grounded only on the misappropriation facts at the conclusion of discovery.

---

**6.** Only a few case have interpreted the displacement provision of the DUTSA, which was adopted from the Model Trade Secret Act. However, several other jurisdictions, with identical provisions, have analyzed the clause. This court considers some of those cases as illustrative.

Count one of the complaint alleges fraud. Plaintiffs assert that defendant and Belmac wrongly used plaintiffs' intellectual property and trade secrets and, while secretly doing so, defendant and Belmac were outwardly assuring plaintiffs that they would never do anything to harm plaintiffs' interests. Plaintiffs assert that these false statements, assurances and omissions resulted in plaintiffs permitting defendant and Belmac continued access to plaintiffs' trade secrets and not taking immediate legal proceedings in response to defendant and Belmac's "theft, misuse and misappropriation" of plaintiffs' intellectual property and trade secrets. This claim is clearly grounded in the same facts which support any misappropriation. The DUTSA specifically identifies misrepresentation as an improper means of obtaining trade secrets. 6 Del. C. § 2001. Thus, the claim must be analyzed under the DUTSA. *See Auto Channel, Inc. v. Speedvision Network,* 144 F.Supp.2d 784, 793 (W.D.Ky. 2001) (holding a claim of misrepresented facts to induce the production of trade secrets must be analyzed under the KUTSA); *Weins v. Sporleder,* 605 N.W.2d 488, (S.D.2000) (finding a fraud claim was necessarily a part of the misappropriation of a trade secret claim).

The third count of the complaint alleges unjust enrichment. Plaintiffs allege that Belmac's misappropriation of plaintiffs' technology, trade secrets and other intellectual property allowed Belmac to "enter the marketplace and compete on equal footing with plaintiffs and others, without incurring the considerable expense of developing an efficient and effective manufacturing process of its own." In addition, plaintiffs assert that Belmac's actions deprived plaintiffs of the opportunity to ben-

efit from their own production process. This claim is based entirely on the same facts which purportedly support the misappropriation of trade secrets and, thus, is displaced by the DUTSA.[7]

The final count in the complaint alleges intentional interference with actual and prospective business relationships. This claim is not preempted by the DUTSA. While some of the same facts that support the misappropriation claim are alleged in the intentional interference count, the intentional interference claim is not necessarily "grounded" in those facts. *See, e.g., Smithfield Ham & Products Co., Inc. v. Portion Pac, Inc.,* 905 F.Supp. at 349. In the *Smithfield* case, the court concluded that plaintiff's intentional interference claim could stand on its own regardless of whether the misappropriation claim succeeded. Plaintiff in *Smithfield* alleged that defendant's imitation product (a barbecue sauce) was a result of misappropriation of trade secrets. The court reasoned that even if the fact finder concluded the imitation sauce was independently made by defendant, the fact finder could still conclude that defendant intentionally interfered with plaintiff's contractual relationship by approaching a known customer of plaintiff with an offer to sell the imitation sauce. *Id.* at 347.

■■ The same holds true for plaintiffs in this case. In Delaware, a claim of intentional interference with contractual relations requires a plaintiff to establish the following elements: "(1) a contract (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Lipson v. Anesthesia Servs., P.A.,*

---

**7.** In *Total Care Physicians v. O'Hara,* the Superior Court of Delaware dismissed an unjust enrichment claim based on the finding that plaintiffs had an adequate remedy at law un-

der the DUTSA. *Total Care Physicians v. O'Hara,* 2002 WL 31667901, *10 (Del.Super.2002).

790 A.2d 1261, 1284 (Del.Super.2001) (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del.Ch. 1987)). A claim for intentional interference with prospective contractual relations requires a showing of: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with the opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of defendant's privilege to compete or protect his business interests in a fair and lawful manner ...." *Lipson*, 790 A.2d at 1285 (citing *DeBonaventura v. Nationwide Mut. Ins.*, 419 A.2d 942, 947 (Del.Ch.1980)). While plaintiffs have not yet fully developed the claim at this early stage of the proceedings, it is too early to dismiss the claim as preempted. Plaintiffs assert in the complaint that they worked to cultivate relationships with companies to sell Omeprazole and entered into economic relationships with customers who wished to purchase the drug. Plaintiffs assert that defendant knew of these relationships. Plaintiffs also assert that defendant interfered in these relationships by stealing and using certain information and this caused plaintiffs' injury. Even if the theft of the information does not rise to the level of misappropriation of trade secrets, the acts may still satisfy the elements in an intentional interference claim. Thus, count four is not dismissed. However, if the claim, once developed, is grounded on the same facts as the misappropriation claim, it will be displaced by the DUTSA.

## V. CONCLUSION

For the above stated reasons, defendant's motion to dismiss for failure to join an indispensable party is denied pending discovery on the issue of agency. Defendant's motion to dismiss counts one and three is granted, but defendant's motion to dismiss count four is denied. An appropriate order shall issue.

## ORDER

At Wilmington this 26th day of September, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED THAT:

1. Defendant's motion to dismiss for failure to join a party (D.I. 9) is denied without prejudice to renew after discovery is completed.

2. Defendant's motion to dismiss counts one and three (D.I. 9) is granted.

3. Defendant's motion to dismiss count four (D.I. 9) is denied.