## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ALARM.COM HOLDINGS, INC.,　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　) C.A. No. 2017-0583-JTL
　　　　　　　　　　　　　　　　　)
ABS CAPITAL PARTNERS INC.,　　　)
ABS PARTNERS V, LLC, and ABS　　)
PARTNERS VII, LLC,　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　)

### MEMORANDUM OPINION

Date Submitted: April 4, 2018
Date Decided: June 15, 2018

Philip A. Rovner, Jonathon A. Choa, Alan R. Silverstein, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Plaintiff.*

Raymond J. DiCamillo, Chad M. Shandler, Matthew W. Murphy, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Steven F. Barley, Andrea W. Trento, HOGAN LOVELLS US LLP, Baltimore, Maryland; *Attorneys for Defendants.*

**LASTER, V.C.**

A private equity firm invested in a Delaware corporation through two funds that it managed. One of the firm's partners served on the corporation's board of directors. The firm later invested in one of the corporation's competitors, and a different partner joined the competitor's board of directors.

The corporation filed suit against the firm and its two funds. The complaint alleges that the private equity firm acquired confidential information from the corporation, including its trade secrets, through the partner's service on the corporation's board of directors. The complaint alleges that the firm misused the corporation's confidential information by investing in the competitor. The complaint asserts a claim for misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA") and a claim for common law misappropriation of confidential information.

The private equity firm moved to dismiss the complaint on multiple grounds. This decision reaches only one. Multiple agreements between the private equity firm and the corporation memorialized that the private equity firm could and would invest in competing businesses. The corporation's certificate of incorporation recognizes that fact. This decision concludes that in light of those agreements, the facts alleged in the complaint do not support a reasonably conceivable inference of misappropriation. The non-statutory claim is pre-empted by DUTSA. The complaint is therefore dismissed.

## I.      FACTUAL BACKGROUND

At this procedural stage, the facts are drawn from the operative complaint and the documents it incorporates by reference. As the non-movant, the plaintiff receives the benefit of all reasonable inferences.

1

**A.      ABS Invests In Alarm.**

Defendant ABS Capital Partners, Inc. ("ABS") is a private equity firm that invests in later-stage growth companies.[1] The firm takes an active role in its investments and markets itself as a strategic partner who will work with management teams to help them achieve the next stage in growth.[2]

Beginning in late 2008, ABS explored a potential investment in Alarm.com Incorporated ("Alarm"). As part of the due diligence process, ABS entered into a non-disclosure agreement with Alarm dated December 12, 2008 (the "2008 NDA"). Paragraph 2 both established ABS's confidentiality undertaking and recognized that ABS might invest in a competing business. It stated:

> You hereby agree that you and your Representatives shall use the Confidential Information solely for the purpose of evaluating the Proposed Transaction, that the Confidential Information will be kept confidential and that you and your Representatives will not disclose any of the Confidential Information in any manner whatsoever; provided, however, that (i) you may make any disclosure of such information to which the Company gives its prior written consent; and (ii) any of such information may be disclosed only to those of your Representatives who need to know such information for the sole purpose of evaluating the Proposed Transaction, who agree to keep such information confidential and who are provided with a copy of this letter agreement and agree to be bound by the confidentiality provisions of this letter agreement.
>
> *Subject to your observance of all the terms of this letter agreement, including the confidentiality obligations, nothing in this letter agreement will prevent you from evaluating a possible investment in and/or collaboration with, or*

---

[1] Compl. ¶ 20-21.

[2] *Id.* ¶ 20.

*entering into any transaction with (including any investment in), a company whose business is similar or competitive with the business of the Company.*

*The Company acknowledges that you deal with many companies, some of which may, independently of the Company, pursue similar or competitive paths regarding their products or services, technology and/or market development plans to those which are or may be pursued by the Company.*

*The occurrence or existence of such similar or competitive activities shall not, by itself, be conclusive evidence that you have failed to observe your confidentiality obligations set forth herein, provided that none of the Confidential Information is provided or disclosed to any Competing Company without the Company's prior written permission.* In any event, you shall be responsible for any breach of this letter agreement by any of your Representatives, and you agree, at your sole expense, to take all reasonable measures (including but not limited to court proceedings) to restrain your Representatives from prohibited or unauthorized disclosure or use of the Confidential Information.[3]

The 2008 NDA expired in accordance with its terms on December 12, 2011.[4]

After conducting due diligence, ABS agreed to acquire a controlling stake in Alarm. The parties formed plaintiff Alarm.com Holdings, Inc. as a new holding company that owned 100% of the equity of Alarm.com Incorporated. ABS caused two of its funds, defendants ABS Partners V, LLC and ABS Partners VII, LLC, to purchase shares of preferred stock issued by Alarm Holdings. The shares of preferred stock carried 80% of Alarm's outstanding voting power.[5]

---

[3] Dkt. 37 Ex. A, ¶ 2 (emphasis and formatting added).

[4] *Id.* ¶ 19 ("This letter agreement and all obligations hereunder shall terminate on the third anniversary of the date hereof . . . .").

[5] For the remainder of this decision, distinctions between Alarm and Alarm Holdings and between ABS and its funds are not important, so this decision refers only to ABS and Alarm.

In connection with the investment, ABS, Alarm, and Alarm's other stockholders entered into a stockholders agreement dated March 6, 2009 (the "2009 Stockholders Agreement").[6] They agreed that Alarm would have a five-member board of directors (the "Alarm Board"), and they agreed that ABS could designate individuals to fill three of the five seats. ABS named Ralph Terkowitz, a partner with the firm, as one of its designees.[7]

Terkowitz served as Chairman of the Board and regularly attended Alarm Board meetings. As a director, Terkowitz was involved in many major business decisions, including determining Alarm's business model, its go-to market strategy, and its pricing strategy. Terkowitz also participated as a director in overseeing Alarm's marketing efforts and its research and development pipeline.[8] Terkowitz spoke regularly with Alarm's CEO about Alarm's business.[9]

Two other ABS partners, Bobby Goswami and Tim Weglicki, served on the Alarm Board. They also participated in Alarm Board meetings and learned confidential information about Alarm. [10]

The 2009 Stockholders Agreement contemplated that investors might own equity in companies with businesses that were similar to Alarm's. The 2009 Stockholders

---

[6] *Id.* ¶ 22.

[7] *Id.* ¶ 23.

[8] *Id.* ¶ 25.

[9] *Id.* ¶ 26.

[10] *Id.* ¶ 27.

4

Agreement also provided that holders of more than 5% of Alarm's equity could have an observer attend Alarm Board meetings, but that right terminated if the equity holder invested "in any entity engaging . . . in the business of selling residential or commercial alarm security products or services, or independent living, health or environmental monitoring products or services."[11] This limitation did not apply to ABS or its representatives on the Alarm Board.

## B.    The 2012 Recapitalization

In 2012, Alarm raised additional capital by creating a new series of preferred stock and issuing shares to investors.[12] As part of this transaction, Alarm adopted an Amended and Restated Certificate of Incorporation (the "Amended Charter").[13] Alarm and its stockholders also entered into an Amended and Restated Stockholders Agreement dated July 11, 2012 (the "2012 Stockholders Agreement").[14] The 2012 Stockholders Agreement superseded the 2009 Stockholders Agreement.

In the 2012 Stockholders Agreement, the parties agreed to increase the size of the Alarm Board to seven members. ABS agreed to reduce its number of designees from three

---

[11] Dkt. 37 Ex. E, § 2.2.

[12] Compl. ¶ 28.

[13] Dkt. 37 Ex. B.

[14] Dkt. 59 Ex. 1.

5

to two.[15] The parties agreed that Terkowitz would continue to serve as Chairman of the Board.[16]

The remaining director seats were allocated among the parties to the 2012 Stockholders Agreement.[17] In addition, the preferred stockholders received Board observer rights. Section 2.2(f) stated that

> [e]ach Observer shall have the right to attend meetings of the Board of Directors and to receive advance notice thereof (but shall not have any rights to any information or materials otherwise provided to members of the Board of Directors or its committees); provided that each Observer shall execute a confidentiality agreement in form and substance reasonably acceptable to the Board of Directors: provided, further, that the Company reserves the right to exclude any Observer from a meeting if the Observer's presence at such meeting would jeopardize any privilege of the Company or involve highly confidential or sensitive information of the Company or otherwise be deemed by a majority of the Board of Directors of the Company to be detrimental to the Company or the Board of Directors' deliberations.[18]

The complaint does not allege that Alarm ever took the step of excluding an observer from the Alarm Board's deliberations.

More importantly for present purposes, Section 12.16 of the 2012 Stockholders Agreement addressed the use of Alarm's confidential information. In the first part of Section 12.16, the parties agreed to protect information that the Company had identified in writing as being confidential or proprietary:

---

[15] *Id.* § 2.2(b).

[16] *Id.* § 2.2(a).

[17] *See id.* § 2.2.

[18] *Id.* § 2.2(f).

6

Each Stockholder agrees, severally and not jointly, to use the same degree of care as such Stockholder uses to protect its own confidential information for any information obtained pursuant to Section 8.1 or Section 8.2 hereof which the Company identifies in writing as being proprietary or confidential and such Stockholder acknowledges that it will not, unless otherwise required by law or the rules of any national securities exchange, association or marketplace, disclose such information without the prior written consent of the Company except such information that

(a) was in the public domain prior to the time it was furnished to such Stockholder,

(b) is or becomes (through no willful improper action or inaction by such Stockholder) generally available to the public,

(c) was in its possession or known by such Stockholder without restriction prior to receipt from the Company,

(d) was rightfully disclosed to such Stockholder by a third party without restriction or

(e) was independently developed without any use of the Company's confidential information. [19]

However, Section 12.16 allowed ABS and other investors to share Alarm's

information to a limited extent:

Notwithstanding the foregoing; each of ABS Capital Partners, TCV, Egis and Backbone may disclose such proprietary or confidential information to any former partners or members who retained an economic interest in such Stockholder, current or prospective partner of the partnership or any subsequent partnership under common investment management, limited partner, general partner, member or management company of such Stockholder (or any employee or representative of any of the foregoing) (each of the foregoing persons, a "Permitted Disclosee") or legal counsel, accountants or representatives for such Stockholder;

provided, however, that such Stockholder shall ensure that such Permitted Disclosees have signed a non-use and non-disclosure agreement in content

---

[19] *Id.* § 12.16 (formatting added).

similar to the provisions of this provision or are otherwise legally obligated not to disclose such confidential information (subject to customary exceptions), prior to disclosure of any such confidential information to such persons.[20]

Alarm also agreed that ABS and another investor could, among other things, "invest[] in . . . any other company (whether or not competitive with the Company)," as long as they did not "disclose or otherwise make use of any proprietary or confidential information of the Company in connection with such activities." In full, this aspect of Section 12.16 stated:

> Furthermore, nothing contained herein shall prevent ABS Capital Partners or TCV or any of their respective Permitted Disclosees from (x) entering into any business, entering into any agreement with a third party, or investing in or engaging in investment discussions with any other company (whether or not competitive with the Company), provided that such Stockholder or Permitted Disclosee does not, except as permitted in accordance with this Section 12.16, disclose or otherwise make use of any proprietary or confidential information of the Company in connection with such activities, or (y) making any disclosures required by or reasonably necessary to comply with law, rule, regulation or court or other governmental order or other legal or regulatory process.[21]

Finally, and most importantly for present purposes, the Amended Charter included a provision authorized by Section 122(17) of the Delaware General Corporation Law (the "DGCL"), which exempts stockholders such as ABS from any duty not to pursue corporate

---

[20] *Id.* (formatting added).

[21] *Id.*

opportunities that otherwise might arguably belong to Alarm.[22] Article 8 of the Amended Charter states:

> To the fullest extent permitted by the DGCL, the Corporation acknowledges that:
>
> (i) each stockholder (subject to the proviso below) and each Preferred Director (each an "Exempted Person") shall have no duty (contractual or otherwise) not to, directly or indirectly, engage in the same or similar business activities or lines of business as the Corporation or any of its subsidiaries, including those deemed to be competing with the Company or any of its subsidiaries; and
>
> (ii) in the event that any Exempted Person acquires knowledge of a potential transaction or matter that may be a corporate opportunity for the Corporation, then such Exempted Person shall have no duty (contractual or otherwise) to communicate or present such corporate opportunity to the Company or any of its subsidiaries, as the case may be, and shall not be liable to the Company or its affiliates or stockholders for breach of any duty (contractual or otherwise) by reason of the fact that such Exempted Person, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another person, or does not present such opportunity to the Company or any of its subsidiaries;
>
> provided, however, that this Article 8 shall not apply to Backbone Partners, LLC or stockholders who are also officers or employees of the Corporation or any subsidiary of the Corporation (other than officers affiliated with any Preferred Director) or who are permitted transferees of any such person.[23]

---

[22] *See* 8 *Del. C.* § 122(17) (providing that a corporation has the power to "[r]enounce, in its certificate of incorporation or by action of its board of directors, any interest or expectancy of the corporation in, or in being offered an opportunity to participate in, specified business opportunities or specified classes or categories of business opportunities that are presented to the corporation or 1 or more of its officers, directors or stockholders").

[23] Dkt. 37 Ex. B, art. 8.

## C. The 2015 IPO

In June 2015, Alarm completed an initial public offering, and its shares began trading on the NASDAQ. With the completion of the IPO, the 2012 Stockholders Agreement expired, and all of the preferred stock that ABS had issued converted into common stock.

In connection with its IPO, Alarm adopted a Code of Business Conduct that addressed conflicts of interest that might arise as a result of funds like ABS having representatives on the Alarm Board. In pertinent part, it stated:

> In the interest of clarifying the definition of "conflict of interest," if any member of the Board who is also a partner or employee of an entity that is a holder of Alarm Common Stock, or an employee of an entity that manages such an entity (each, a "*Fund*"), acquires knowledge of a potential transaction (investment transaction or otherwise) or other matter other than in connection with such individual's service as a member of the Board (including, if applicable, in such individual's capacity as a partner or employee of the Fund or the manager or general partner of a Fund) that may be an opportunity of interest for both the Company and such Fund (a "*Corporate Opportunity*"), then, provided that such director has acted reasonably and in good faith with respect to the best interests of the corporation, such an event shall be deemed not to be a "conflict of interest" under this policy.[24]

After the IPO, Terkowitz continued to serve on the Alarm Board and to serve on various committees. He ultimately resigned in August 2016.[25] No representative of ABS has held a position with Alarm since then.

---

[24] Dkt. 37 Ex. C, at 2.

[25] Compl. ¶ 30.

According to Alarm, Terkowitz attended many meetings of the Alarm Board during his years of service as a director, including meetings on March 19, 2014; June 4, 2014; September 17, 2014; December 3, 2014; February 26, 2015; May 6, 2015; August 5, 2015; November 5, 2015; February 23, 2016; May 3, 2016; and July 29, 2016.[26] The complaint alleges that Terkowitz obtained confidential information during these meetings, including information that "was too sensitive to ever be placed in writing or be included in the board decks."[27] Alarm believes that Terkowitz passed this information along to his partners at ABS in oral and written reports.

**D.     ABS Invests In Resolution.**

In September 2017, ABS acquired a significant ownership stake in Resolution Products, Inc. ("Resolution"), a venture that competes directly with Alarm.[28] As part of its investment, ABS gained the right to appoint one member to the Resolution board of directors (the "Resolution Board"). ABS appointed Phil Clough, one of its partners.[29]

Clough had never served on the Alarm Board, nor had he observed any meeting of the Alarm Board. ABS did not nominate Terkowitz to the Resolution Board. Alarm has not alleged that ABS has any intention of nominating Terkowitz to the Resolution Board.[30]

---

[26] *Id.* ¶ 34.

[27] *Id.* ¶ 35.

[28] *Id.* ¶ 63.

[29] *Id.* ¶ 66.

[30] *Id.* ¶ 8.

11

## II.     LEGAL ANALYSIS

Citing ABS's investment in Resolution and Clough's service as a Resolution director, Alarm claims that ABS must already have misappropriated or inevitably will misappropriate its trade secrets in violation of DUTSA or, in the absence of any trade secrets, has engaged or inevitably will engage in common law misappropriation of Alarm's confidential information.[31] ABS has moved to dismiss the complaint pursuant to Court of Chancery Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering such a motion:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [ (iv) ] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[32]

Taking into account the relationship between Alarm and ABS, which is documented through the 2008 NDA, the 2009 Stockholders Agreement, the 2012 Stockholders Agreement, and continues to be governed by the Amended Charter, it is not reasonably conceivable based on the facts alleged that ABS has engaged in misappropriation under DUTSA. The common law claim is preempted by DUTSA. The complaint is therefore dismissed.

---

[31] *See* Dkt. 27 ¶ 71-99.

[32] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotation marks and citations omitted).

**A.      Alarm's Claim For Misappropriation Of Trade Secrets Under DUTSA**

Count I of the complaint asserts that ABS violated DUTSA by misappropriating Alarm's trade secrets. To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead four elements:

(i)      A trade secret exists.

(ii)     The plaintiff communicated the trade secret to the defendant.

(iii)    The communication was made pursuant to an express or implied understanding that the defendant would maintain the secrecy of the information.

(iv)    The trade secret has been misappropriated within the meaning of that term as defined in … DUTSA.[33]

ABS contends that Alarm has not met any of the necessary elements.

This decision assumes for purposes of analysis that (i) at least some of the information that Alarm communicated to its directors constituted trade secrets, (ii) the information was communicated to Terkowitz and ABS, and (iii) the communication was made pursuant to an express or implied understanding that Terkowitz and ABS would maintain the secrecy of the information. In other words, this decision assumes for purposes of analysis that the first three elements of a DUTSA claim are met. Under the facts alleged in the complaint, the claim still founders on the fourth element because Alarm has not pled facts supporting a reasonable inference of misappropriation.

Section 2001(2) of DUTSA states that "misappropriation" shall mean:

---

[33] *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *13 (Del. Ch. Mar. 5, 2014).

13

a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

b. Disclosure or use of a trade secret of another without express or implied consent by a person who:

   1. Used improper means to acquire knowledge of the trade secret; or

   2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [secret] was:

      A. Derived from or through a person who had utilized improper means to acquire it;

      B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

      C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.][34]

Section 2001(1) of DUTSA states that "'improper means' shall include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."[35]

Ultimately, at trial, Alarm would be able to rely on circumstantial evidence when attempting to prove misappropriation.[36] "Misappropriation and misuse can rarely be proved by convincing direct evidence."[37] Instead, in most cases "plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw

---

[34] 6 *Del. C.* § 2001(2).

[35] *Id.* § 2001(1).

[36] *Savor, Inc. v. FMR Corp.*, 2004 WL 1965869, at *8 (Del. Super. July 15, 2004).

[37] *Greenberg v. Croydon Plastics Co., Inc.*, 378 F. Supp. 806, 814 (E.D. Pa. 1974).

inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place."[38] Consequently, at the pleading stage, Alarm need only plead sufficient facts to make it reasonably conceivable that circumstances exist from which the necessary inferences can be drawn.

Even given this relaxed pleading standard, Alarm's complaint does not support a reasonably conceivable inference of misappropriation. Alarm relies only on ABS's investment in Resolution, made approximately a year after Terkowitz left Alarm and following an auction in which ABS outbid other potential investors. In my view, these circumstances only support an inference that ABS invested in a company that competes with Alarm, just as Alarm and ABS always understood ABS could do.

Alarm and ABS's shared understanding about ABS's ability to invest in a competitor dates back to the 2008 NDA. In that document, Alarm acknowledged to ABS that "you deal with many companies, some of which may, independently of the Company, pursue similar or competitive paths regarding their products or services, technology and/or market development plans to those which are or may be pursued by the Company."[39] Alarm agreed that "[s]ubject to your observance of all the terms of this letter agreement, including the confidentiality obligations, nothing in this letter agreement will prevent you from

---

[38] *Merck & Co., Inc. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354, at *20 (Del. Ch. Aug. 5, 1999) (internal quotation marks omitted) (quoting *Greenberg*, 378 F. Supp. at 814), *aff'd*, 766 A.2d 442 (Del. 2000).

[39] Dkt. 37 Ex. A, ¶ 2.

15

evaluating a possible investment in and/or collaboration with, or entering into any transaction with (including any investment in), a company whose business is similar or competitive with the business of the Company."[40]

The 2008 NDA is not controlling, and it expired by its terms in 2011, but it evidences the original understanding between the parties about ABS's ability to invest in competing companies. The same is true about the 2009 Stockholders Agreement and the 2012 Stockholders Agreement. The former, which was superseded by the latter, contemplated that certain investors with board observer rights could not exercise those rights if they invested in a competitive company, but did not apply that limitation to ABS.[41] The 2012 Stockholders Agreement, which terminated when Alarm completed its IPO, stated that "nothing contained herein shall prevent ABS . . . from . . . investing in or engaging in investment discussions with any other company (whether or not competitive with the Company)."[42] When doing so, ABS was not permitted to "make use of any proprietary or confidential information of the Company in connection with such activities," but the 2012 Stockholders Agreement thereby recognized that the fact of an investment in a competitor, standing alone, would not give rise to a violation.[43] The same agreement

[40] *Id.*

[41] Dkt. 37 Ex. E, § 2.2.

[42] Dkt. 59 Ex. 1, § 12.16.

[43] *Id.*

16

specified that the Company would have to "identif[y]" information "in writing as being proprietary or confidential."[44]

The 2008 NDA, the 2009 Stockholders Agreement, and the 2012 Stockholders Agreement thus establish an understanding that an investment by ABS in a competitor, without more, would not constitute improper use that could give rise to a claim for misappropriation. To the contrary, the concept that ABS could make such an investment was something the parties anticipated, contemplated, and permitted.

Cementing this understanding is the Amended Charter, which, along with the Code of Conduct, remains binding and operative. Under Article 8, ABS, Terkowitz, and the other ABS representatives on the Alarm Board had "no duty (contractual or otherwise) not to, directly or indirectly, engage in the same or similar business activities or lines of business as the Corporation."[45] The effect of this provision, which is authorized by Section 122(17) of the DGCL, is to waive any claim for breach of the duty of loyalty against ABS, Terkowitz, or the other ABS director representatives based on either usurpation of a corporate opportunity or anticompetitive activity.[46]

---

[44] *Id.*

[45] Dkt. 37 Ex. B, art. 8.

[46] *See, e.g.*, *Wayne County Empls.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *17 (Del. Ch. July 24, 2009) ("It is conceded that 8 *Del. C.* § 122(17) permits a corporation to renounce in its certificate of incorporation any interest or expectancy in a corporate opportunity."); Senate Bill 363: Original Synopsis, Del. Gen. Assembly, http://legis.delaware.gov/BillDetail?LegislationId=10399 (last visited June 13, 2018) ("[Section 122(17)] is intended to eliminate uncertainty regarding the power of a corporation to renounce corporate opportunities in advance raised in *Siegman v. Tri-Star*

17

The clear intent of Article 8 is to permit ABS to invest in competing companies like Resolution. If Alarm had attempted to assert a claim for breach of the fiduciary duty of loyalty against ABS or its representatives, then they could have invoked Article 8 as a defense. In my view, this fact counsels against permitting Alarm to bring a comparable claim based on a statutory theory that operates against non-fiduciaries. As illustrated by the seminal decision of *Guth v. Loft, Inc.*,[47] a claim for breach of the fiduciary duty of loyalty based on usurpation of a corporate opportunity empowers a court to enforce the special and heightened relationship that exists between a fiduciary and the *cestui que trust*.[48] When a corporation has waived that claim, it gives up the most powerful remedial

_____

*Pictures, Inc.*, [1989 WL 48746 (Del. Ch. May 5, 1989)]. It permits the corporation to determine in advance whether a specified business opportunity or class or category of business opportunities is a corporate opportunity of the corporation rather than to address such opportunities as they arise. The subsection does not change the level of judicial scrutiny that will apply to the renunciation of an interest or expectancy of the corporation in a business opportunity, which will be determined based on the common law of fiduciary duty, including the duty of loyalty."); 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations and Business Organizations* § 4.16 (3d ed. Supp. 2014) ("In the 2000 Amendments to the Delaware General Corporation Law, Section 122 was amended to provide that a corporation may renounce any interest in specific business opportunities of the corporation."); Mark J. Loewenstein, *The Deverging Meaning Of Good Faith*, 34 Del. J. Corp. L. 433, 460-61 (2009) (same). *See generally*, Gabriel Rauterberg & Eric Talley, *Contracting out of the Fiduciary Duty of Loyalty: An Empirical Analysis of Corporate Opportunity Waivers*, 117 Colum. L. Rev. 1075, 1089-1101 (2017). No one has challenged the scope of the waiver, and this decision provides no opportunity to opine on the validity of a broad and general renunciation of corporate opportunities, as contrasted with a more tailored provision addressing a specified business opportunity or a well-defined class or category of business opportunities.

[47] 5 A.2d 503 (Del. 1939).

[48] *Id.* at 510.

tool that a court of equity possesses. Once a corporation has given up its most effective check on fiduciary misbehavior, it would be counterintuitive to permit the same corporation to pursue the lesser theories that could be asserted against a non-fiduciary. Respecting the waiver contemplated by Section 122(17) requires that courts not attempt to forge a fiduciary substitute.[49]

In my view, in light of the clear understanding that ABS could invest in competitive businesses, it is not reasonably conceivable that the fact of ABS's investment in Resolution and the placement of a different ABS representative on the Resolution Board could support an inference of misappropriation. The only reasonably conceivable inference is that the parties contemplated that ABS could do precisely what it did. The complaint fails to state a claim under DUTSA.

## B. DUTSA Preempts The Claim For Common Law Misappropriation.

Count II of the complaint asserts a claim for common law misappropriation. In my view, DUTSA preempts this claim.

Delaware modeled DUTSA on the Uniform Trade Secrets Act (the "Uniform Act"), which the American Law Institute drafted to address the "uneven and unsatisfactory development" of "state trade secrets law" and "codif[y] the basic principles of common law trade secret protection."[50] The drafters of the Uniform Act sought to create a bipartite

---

[49] *See Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018-19 (Del. Ch. 2010).

[50] *Reingold v. Swiftships Inc.*, 210 F.3d 320, 322-23 (5th Cir. 2000).

19

categorization of commercial knowledge into either "a protected 'trade secret' or unprotected 'general skill and knowledge.'"[51] To achieve this goal, the drafters sought to preempt other causes of action that parties could use to elide the distinction and pursue remedies based on information that did not rise to the level of a trade secret.[52]

The preemption provision in DUTSA states:

(a) Except as provided in subsection (b) of this section, this chapter displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret.

(b) This chapter does not affect:

(1) Contractual remedies, whether or not based upon misappropriation of a trade secret;

(2) Other civil remedies that are not based upon misappropriation of a trade secret; or

(3) Criminal remedies, whether or not based upon misappropriation of a trade secret.[53]

---

[51] *See* Robert Unikel, *Bridging the "Trade Secret" Gap: Protecting "Confidential Information" Not Rising To The Level Of Trade Secrets*, 29 Loy. U. Chi. L.J. 841, 868 & n.20 (1998); *see also Restatement (Third) of Unfair Competition* §§ 39, 41 (Am. Law Inst. 1995); *cf.* Edmund W. Kitch, *The Expansion of Trade Secrecy Protection and the Mobility of Management Employees: A New Problem for the Law*, 47 S.C. L. Rev. 659, 662 (1996) ("The Restatement of Unfair Competition, following the lead of the Uniform Trade Secrets Act and cases following the Act, eliminates the distinction between information that is a trade secret and other confidential information. All secret information of economic value falls within the definition of trade secrets." (footnotes omitted)).

[52] *See generally* Unikel, *supra*, at 871-88.

[53] 6 *Del. C.* § 2007.

As a result of this section, if "common law claims are based on the same alleged wrongful conduct as the trade secret claims, they are precluded under 6 *Del. C.* § 2007."[54]

As I read this provision, it preempts a claim for common law misappropriation of confidential information. Contrary to the intent of the Uniform Act, permitting this claim would enable a party to seek to enforce a common law cause of action for "unprotected 'general skill and knowledge.'"

Alarm argues that two prior decisions of this court recognize that DUTSA does not have preemptive effect on common law claims that are based on the same wrongful conduct as a trade secret claim. In *Beard Research*, this court held that a plaintiff's claim for breach of fiduciary duty was not preempted by DUTSA.[55] In reaching that conclusion, the court reasoned that "[t]he same facts are not required to establish all the elements of both the misappropriation and breach of fiduciary duty claims,"[56] and the court noted that a defendant could have breached his fiduciary duties by taking and misusing confidential information that did not rise to the level of a trade secret.[57] In my view, the distinguishing fact in *Beard Research* was the existence of a fiduciary relationship, which required proof beyond what is required for misappropriation under DUTSA and which brings with it

[54] *Savor*, 812 A.2d at 898.

[55] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 602 (Del. Ch. 2010).

[56] *Id.*

[57] *Id.*

21

special duties and obligations.[58] A claim for common law misappropriation, by contrast, has the same scope and parameters as a claim for misappropriation under DUTSA. The only difference is that the common law claim extends protection to materials that do not qualify as a trade secret. As a result, it runs contrary to the purpose underlying DUTSA of distinguishing between protected trade secrets and non-protectable business information.

Alarm also relies on *Overdrive*, where this court permitted a conversion claim to proceed notwithstanding the preemption provision in DUTSA.[59] The court reasoned that for preemption under DUTSA to apply, the claims must be "grounded in the same facts," which means that "the same facts are used to establish all the elements of both claims."[60] The *Overdrive* court held that the success of the plaintiff's conversion claim did not "*necessarily* depend on the success of plaintiff's misappropriation of trade secrets claim"[61] and that no element of a claim for conversion turned on whether the plaintiff's property constituted "'confidential information' or a 'trade secret.'"[62] The court later added that "[i]f

---

[58] *See id.* at 601-02.

[59] *Overdrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *4 (Del. Ch. June 17, 2011).

[60] *Id.* (internal quotation marks omitted) (quoting *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 631 F. Supp. 2d 504, 508 (D. Del. 2009)).

[61] *Id.* at *5.

[62] *Id.* at *5 n.31.

22

it turns out later that plaintiff's conversion claim *is* 'based upon' a trade secret, it will be preempted by DUTSA."[63]

The *Overdrive* decision gave relatively brief treatment to the preemption issue. It did not explore the intent of the drafters of the Uniform Act or the rationale for the preemption provision. It also did not discuss the Delaware Supreme Court's decision in *Savor*, which held that DUTSA preempted common law claims alleging unfair competition and civil conspiracy.[64] Unlike the litigants in *Beard Research*, the defendants in *Overdrive* did not have a special fiduciary relationship with the plaintiff. Nor did *Overdrive* otherwise distinguish the conversion claim from a setting where DUTSA would apply. In substance, the *Overdrive* decision limited the scope of the preemption provision in DUTSA on conversion claims to claims involving information that met the statutory definition of a trade secret.

A more recent Delaware Superior Court decision has reasoned through these issues thoroughly.[65] The *Atlantic Medical* decision concluded that "Delaware has joined the 'majority view' that section 7 of DUTSA precludes common law claims based on misappropriation of business information even in cases in which the claim does not meet

---

[63] *Id.*

[64] *Savor*, 812 A.2d at 898.

[65] *Atl. Med. Specialists, LLC v. Gastroenterology Assocs., P.A.*, 2017 WL 1842899 (Del. Super. Apr. 20 2017).

23

the statutory definition of 'trade secret' under the Code."[66] Other jurisdictions likewise have interpreted their versions of the Uniform Act to abolish all common law theories for misappropriation of confidential information.[67] Preemption applies "regardless of whether the information would ultimately rise to the level of a trade secret."[68]

Regardless, *Overdrive* does not speak to this case. Alarm has not asserted a claim for conversion. Alarm has asserted a claim for common law misappropriation of confidential information, which to my mind is the clearest possible candidate for

---

[66] *See id.* at \*15; *accord Yeiser Research & Development LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1050 (S.D. Cal. 2017) ("Because all claims stemming from the same acts as the alleged misappropriation are intended to be displaced, a claim can be displaced even if the information at issue is not a trade secret" and therefore "a determination of whether the information at issue constitutes a trade secret under [DUTSA] need not be addressed prior to making a determination of displacement") (internal quotation marks and citation omitted); *see also Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) (same).

[67] *See, e.g.*, *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) (holding Illinois' statute "has abolished all common law theories of misuse of [secret] information. Unless defendants misappropriated a (statutory) trade secret, they did no legal wrong" (citation omitted)); *Hauck Mfg. v. Astec Indus.*, 375 F. Supp. 2d 649, 656 (E.D. Tenn. 2004) ("If the information is a trade secret, the plaintiff's claim is preempted; if not, the plaintiff has no legal interest upon which to base his or her claim. Either way, the claim is not cognizable."); *Bliss Cleaning Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 948-49 (W.D. Mich. 2003) ("[T]he Court concludes that the disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by the MUTSA . . . . [A]llowing otherwise displaced tort claims to proceed on the basis that the information may not rise to the level of a trade secret would defeat the purpose of the UTSA." (citation omitted)).

[68] *Yeiser Research*, 281 F. Supp. 3d at 1051.

preemption under DUTSA. Count II of the complaint is preempted by DUTSA and dismissed on that basis.

## C.     The Request To Amend

Alarm has requested leave to amend its complaint to further describe its trade secrets. Alarm contends that good cause exists for the court to grant the request and allow Alarm to supplement the information under Court of Chancery Rule 15(aaa).

Alarm's request is denied. During an initial hearing on a motion to expedite, I voiced concern about Alarm's allegations and instructed Alarm to specify the trade secrets that were misappropriated and how the misappropriation occurred.[69] Alarm has therefore already had a chance to do what it now seeks leave to accomplish.

In any event, this decision has not held that the complaint fails to identify trade secrets. The complaint fails because Alarm has not pled a reasonably conceivable set of circumstances under which ABS misappropriated or improperly used Alarm's trade secrets. This is not a failure that can be cured by requiring "the plaintiff to simply supplement that information."[70]

## III.     CONCLUSION

Alarm's complaint fails to state a claim on which relief can be granted. It is dismissed with prejudice.

---

[69] Dkt. 26 at 9-10.

[70] Pl.'s Answering Br. ¶ 51.

25